```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA for the use
and benefit of Solera Construction,
Inc., et al.,
                                              REPORT &
                    Plaintiff,               RECOMMENDATION

          - against -                         CV 2003-1383 (SJF)(MDG)


J.A. JONES CONSTRUCTION GROUP, LLC,
et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - -X
```

On May 31, 2006, this Court entered a default judgment in favor of plaintiff United States of America for the use and benefit of Solera Construction, Inc. and DCM Erectors, Inc., a joint venture ("Solera/DCM"), against LBL Skysystems (USA), Inc. ("LBL USA"). See ct. doc. 136. In efforts to enforce its judgment against LBL USA, Solera/DCM served an information subpoena, a subpoena duces tecum and a restraining notice upon Turner Construction Corporation ("Turner"). Solera/DCM has moved to compel responses to the subpoenas served, which it claims are designed to elicit information regarding funds allegedly due to LBL USA and its Canadian parent, LBL Skysystems Corporation ("LBL Canada"). Ct. docs. 189, 193.

Laurentian Bank of Canada (the "Bank") has moved to vacate the restraining notice Solera/DCM served on Turner to permit Turner to transfer funds to the Bank owed by LBL Canada.[1] See ct. doc. 194.

## BACKGROUND

On or about December 4, 1996, Turner and LBL Canada entered into a subcontract agreement related to the construction of the United States Courthouse in Islip, N.Y. (the "Islip project"). See ct. doc. 214, Exh. 3; ct. doc. 221 at 2. In September 2007, Turner settled its claims and subcontractor pass-through claims relating to the Islip project with the United States General Services Administration ("GSA"). See ct. doc. 221 at 2. Shortly thereafter, Turner agreed to pay $975,000 to LBL Canada, with an additional $25,000 to be paid in the future after disputes with respect to alleged leaks are resolved. Id.

On December 16, 1998, the Bank granted to LBL Canada a credit facility in the amount of $9,150,000 CDN which was eventually increased to $20,000,000 CDN (the "Loan"). Affidavit of Alain Desrochers dated January 18, 2008 ("Desrochers Aff.")

---

[1] Since, as discussed below, I find that priority over the funds at issue is dispositive of the motions, I address the parties' dispute as a report and recommendation. See Columbia Record Prods. v. Hot Wax Records, Inc., 966 F.2d 515 (9th Cir. 1992) (finding no statutory basis for magistrate judge to issue final judgment assigning priorities among creditors); Colorado Building and Constr. Trades Council v. B.B. Andersen Constr. Co., Inc., 879 F.2d 809 (10th Cir. 1989) (same).

(ct. doc. 200) at ¶ 2, Exhs. A, B, C. The Loan is guaranteed by an agreement of general suretyship made by LBL USA in favor of the Bank in the amount of $20,000,000 CDN. Id. at ¶ 3, Exh. D. In connection with the Loan, the Bank entered into security agreements with LBL Canada and LBL USA dated October 19, 1999, which grant the Bank a security interest in the assets, including the receivables, of LBL Canada and LBL USA. Id. at ¶ 4, Exhs. E, F. As of December 21, 2007, the outstanding balance under the Loan was $4,901,856.40 CDN. Id. at ¶ 9, Exh. K.

On October 21, 1999, the Bank registered its security interest in LBL Canada's receivables by filing an application for registration in the Quebec Register of Personal and Moveable Real Rights. Id. at ¶ 5, Exh. G. On February 10, 2000 and November 28, 2006, the Bank filed UCC-1 financing statements with the New York Department of State, perfecting its security interest in LBL USA's receivables. Id. at ¶¶ 6-7, Exhs. H, I.

After Solera/DCM obtained a default judgment in this Court against LBL USA in the amount of $4,092,237.07, Solera/DCM's counsel issued a writ of execution to the United States Marshal for the Eastern District of New York on August 30, 2006 naming LBL USA as the entity to be levied upon. See ct. doc. 214 at 5, Exh. 8. The Marshal served the writ on Tratoros Construction Inc. on August 30, 2006. See ct. doc. 214, Exh. 8. Solera/DCM later served Turner with information subpoenas and restraining

notices regarding any funds to be paid to LBL USA on October 12, 2007. See ct. doc. 214, Exh. 1.

By order dated March 20, 2009, this Court granted the request of the Bank and Turner to deposit the funds at issue with the Clerk of the Court.

**DISCUSSION**

I first address the question of priority to the funds that Turner owes LBL Canada since determination of this issue is dispositive of both the Bank's motion to vacate the restraining notice on Turner and Solera/DCM's motion to compel discovery.

In arguing that Solera/DCM's restraining notice should be vacated, the Bank contends that Solera/DCM's judgment against LBL USA does not entitle it to any claim to the Turner funds owed to LBL Canada, its corporate parent. Solera/DCM responds that it has a valid claim to the Turner funds because LBL USA and LBL Canada are one and the same or because the Turner funds are properly assets of LBL USA which Solera/DCM claims is the entity that did the relevant work on the Islip project. The Bank counters that even if Solera/DCM could demonstrate either that the corporate veil should be pierced between LBL Canada and LBL USA or that the Turner funds should be deemed the assets of LBL USA, the Bank has priority to the assets of both LBL entities by virtue of its prior perfected security interests.

Priority to the Assets of LBL USA

Rule 69(a)(1) of the Federal Rules of Civil Procedure provides for enforcement of judgments according to the practice and procedure of the state in which the district court is held. See Fed. R. Civ. P. 69(a)(1); see also 28 U.S.C. § 1962 (enforceability of district court judgment depends on state court practice). The New York Civil Practice Law and Rules (the "CPLR") governs priorities in personal property between judgment creditors and transferees (see N.Y. C.P.L.R. § 5202) and among judgment creditors (see N.Y. C.P.L.R. § 5234). See David D. Siegel, N.Y. C.P.L.R. 5202, Practice Commentaries, C5202:1; David D. Siegel, New York Practice § 518 (4th ed. 2005). Article 52 of the CPLR sets forth the various procedures available for enforcement of judgments under New York law and governs the type of property that is subject to execution and levy. See Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A., 190 F.3d 16, 20-21 (2d Cir. 1999); Marshak v. Green, 746 F.2d 927, 930-31 (2d Cir. 1984). By contrast, Article 9 of the New York Uniform Commercial Code (the "UCC") provides a comprehensive scheme addressing security interests in personal property, the means by which those security interests may be perfected and the priorities in collateral among interested parties.

Under the UCC, the local law of the jurisdiction in which a debtor is "located" governs "perfection, the effect of perfection or nonperfection and the priority of a security interest in

collateral." N.Y. U.C.C. § 9-301(a).  For a "registered organization organized under state law," a debtor's location is the state under the law of which it is organized.  N.Y. U.C.C. § 9-307(e).  Since LBL USA was organized as a New York corporation, LBL USA is "located" in New York for purposes of Article 9 and New York law governs a security interest's perfection, the effect of perfection and priority in its assets.

A security interest becomes valid and enforceable against the debtor and third parties after the occurrence of three events: (1) the debtor has signed a security agreement that contains a description of the collateral; (2) the secured party has given value to the debtor; and (3) the debtor has acquired rights in the collateral. <u>Continental Coffee Prod. Co. v. Banque Lavoro S.A.</u>, 852 F. Supp. 1235, 1237 (S.D.N.Y. 1994); see <u>Lashua v. LaDuke</u>, 707 N.Y.S.2d 542, 544 (3d Dep't 2000).  "Once these three events have occurred, the security interest is enforceable and the interest is said to have 'attached.'"  <u>Continental</u>, 852 F. Supp. at 1237.  An attached security interest in an account of a corporation organized under the laws of New York is perfected by filing a UCC-1 financing statement with the New York Department of State.  N.Y. U.C.C. §§ 9-301(a), 9-501(a)(2).  The financing statement must provide the name of the debtor, the name of the secured party and indicate the collateral covered by the financing statement.  N.Y. U.C.C. § 9-504.

Here, the Bank has demonstrated that LBL USA signed a security agreement with the Bank, that the Bank gave value by loaning funds and that the Bank perfected its security interest in LBL USA's assets by filing a UCC-1 financing statement on February 10, 2000 with the New York Department of State naming LBL USA as the debtor and describing the collateral that it covers.[2]

However, the Bank's security interest in the accounts of LBL USA became unperfected when the UCC-1 financing statement lapsed five years later. See N.Y. U.C.C. § 9-515(a), (c). The Bank did not re-perfect its security interest until it filed a second UCC-1 financing statement on November 28, 2006.

Under the UCC, once the first financing statement lapsed, a "lien creditor" could gain priority in the collateral if its lien arose after the security interest became and remained unperfected. See N.Y. U.C.C. § 9-317(a)(2)(A) and cmt. 4. A "lien creditor" is defined as "a creditor that has acquired a

---

[2] Although the Bank had assigned two-thirds of its interest in LBL Canada's receivables relating to the Islip project to the Fonds de Solidarite des Travailleurs du Quebec (the "Fonds"), the Fonds reassigned its portion of the interest back to the Bank. See Affidavit of Alain Desrochers dated February 13, 2008 ("2/13/08 Desrochers Aff.") at ¶ 2, Exh. A; 1/18/08 Desrochers Aff. at ¶ 11, Exh. C. On November 22, 2002, the Bank entered into an agreement with London Guarantee Insurance Company assigning its security interest in the accounts of LBL Canada and LBL USA only with respect to certain construction projects. See 2/13/08 Desrochers Aff. at ¶ 4. The Islip project was not one of the projects included in that agreement. See id.

lien on the property by attachment, levy or the like." N.Y. U.C.C. § 9-102(a)(52)(A); see also 9B William D. Hawkland, Hawkland UCC Series § 9-317:2 (Rev.) (2006) ("[T]he lien obtained by the creditor must be on the same property which forms the collateral securing the unperfected security interest"). Under the New York CPLR, a levy upon personal property that is "not capable of delivery," or upon any debt owed to the judgment debtor, is effected by service of a copy of an execution upon the "garnishee." N.Y. C.P.L.R. § 5232(a); Siegel, N.Y. C.P.L.R. §§ 5230, 5232, Practice Commentaries, C5230:6, C5232:2; Siegel, New York Practice §§ 487, 491 ("Enforcement of a judgment on a debt must be effected through the garnishee"). The "garnishee" is a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest. See N.Y. C.P.L.R. § 105(I).

The requirements for a levy are set forth in section 5232(a):

> In order for a lien to be perfected based on a levy by service of execution: 1) there must be a judgment; 2) an execution must have been issued by the judgment creditor; 3) the Sheriff must have made a levy, which is effected by service of the execution upon the garnishee; and 4) the property or debt to be seized must be transferred or paid to the Sheriff or support collection unit within 90 days after a levy is made by service of the execution.

In re Flax, 179 B.R. 408, 411 (Bankr. E.D.N.Y. 1995). Thus, Solera/DCM could have acquired priority over the Bank's security

interest if it had levied on the Turner assets at issue during the 20 plus month period after the Bank's first UCC-1 statement lapsed on February 2, 2005 and the Bank filed its second financing statement on November 28, 2006.

On August 30, 2006, Solera/DCM's counsel issued a writ of execution to the U.S. Marshal naming LBL USA as the judgment debtor. See ct. doc. 214, Exh. 8. However, Solera/DCM has not demonstrated that any levy was effected on the property at issue. It provided only one return of service of its writ of execution on "Trataros Construction, Inc." See id. However, by its terms, CPLR 5232(a), requires that a writ of execution be made upon the garnishee (Turner) specifying that:

> A levy by service of the execution is effective only if, at the time of service, the person served owes a debt to the judgment debtor or obligor or he or she is in possession or custody of property not capable of delivery in which he or she knows or has reason to believe the judgment debtor or obligor has an interest or that the judgment debtor or obligor has an interest in specified property not capable of delivery in the possession or custody of the person served.

N.Y. C.P.L.R. § 5232(a). Delivery of an execution to the Marshal only accomplishes priority to personal property as against transferees and other judgment creditors of the debtor. See In re Thriftway Auto Rental Corp., 457 F.2d 409, 411 (2d Cir. 1972); N.Y. C.P.L.R. §§ 5202, 5234; Siegel, New York Practice §§ 518-21. Absent any evidence that the writ of execution was served on Turner, the garnishee, or that notice was served on LBL USA, plaintiff's execution is ineffective as to Turner's debt. See

-9-

Kitson v. Kitson, 835 N.Y.S.2d 670, 672 (2d Dep't 2007); N.Y. C.P.L.R. § 5232(a), (c); cf. Citibank v. Prime Motor Inns Limited P'ship, 98 N.Y.2d 743, 744-45 (2002) (bank had priority because it properly levied upon funds before creditor filed UCC statement); Ruppert v. Community Nat'l Bank, 254 N.Y.S.2d 341, 344 (1st Dep't 1964) (where return of an execution is unsatisfied the execution is deemed to have expired); 96 N.Y. Jur.2d Secured Transactions § 290 ("A judgment creditor may establish its superior right by properly levying before another creditor perfects a security interest in the property at issue").

Moreover, even assuming that the Marshal had served the writ of execution on Turner and served notice on LBL USA that constituted a levy on the Turner funds, the levy would have expired and become void 90 days after service of the execution and no assets had been transferred to the Marshal.[3] See Kitson, 40 N.Y.S.2d at 672; Kitson & Kitson v. City of Yonkers, 778 N.Y.S.2d 503, 507 (2d Dep't 2004); New York State Commissioner of Taxation and Finance v. Bank of N.Y., 712 N.Y.S.2d 543, 544-45 (1st Dep't 2000); N.Y. C.P.L.R. § 5232(a); see also Ruppert, 254

---

[3] Even if Solera/DCM became a "lien creditor" under the UCC simply by delivery of an execution to the U.S. Marshal, any lien that attached also would have expired after ninety days. See Marine Midland Bank-Central v. Gleason, 405 N.Y.S.2d 334, 338 (4th Dep't 1978) ("lifetime of an execution relating to property not capable of delivery is ninety days"); N.Y. C.P.L.R. 5232(a); cf. New York City Transit Auth. v. Paradis Guard Dogs, Inc., 565 F. Supp. 388, 390-91 (E.D.N.Y. 1983) (execution delivered to sheriff expired after sixty days since no levy was made).

N.Y.S.2d at 344 (where execution is deemed to have expired, it is treated as if chattels had never been levied upon). In fact, Turner did not acquire any funds until after it settled its dispute with the GSA in September 2007.

Since Solera/DCM's levy either was never effective or became void, Solera/DCM is not a "lien creditor" under the UCC. Accordingly, the Bank's unperfected security interest took priority over Solera/DCM's judgment because it was the first to attach. See N.Y. U.C.C. § 9-322(a)(3). The Bank's perfected security interest also takes priority over Solera/DCM's unperfected judgment after the Bank re-perfected its security interest by filing a UCC-1 financing statement in November 2006. See N.Y. U.C.C. § 9-322(a)(2); Resner v. Greely, 622 N.Y.S.2d 330, 331 (2d Dep't 1995) (holding that secured creditor's rights were superior to judgment creditor where UCC-1 filing predated perfection of judgment lien); Travelers Cas. & Sur. Co. of America v. Target Mech. Sys., 800 N.Y.S.2d 358 (Sup. Ct., Kings Co. 2004) ("Where secured creditor's UCC-1 filing predated perfection by judgment creditors of their judgment liens, rights of secured creditor come first").

Moreover, Solera/DCM did not acquire priority over the Bank, a secured creditor, by serving a restraining notice on Turner. See Aspen Indus., Inc. v. Marine Midland Bank, 52 N.Y.2d 575,

579-80 (1981); Kitson, 778 N.Y.S.2d at 507.[4]  Contrary to Solera/DCM's position, Int'l Ribbon Mills, Ltd. v. Sturtz, 36 N.Y.2d 121 (1975) does not hold otherwise.  In Int'l Ribbon, the judgment creditor served the judgment debtor with a restraining notice before the judgment debtor executed an assignment.  36 N.Y.2d at 123-26.  That assignment was made without consideration and in violation of the restraining notice.  Id. at 125.  By contrast, here, in exchange for substantial loans, the Bank obtained and perfected a security interest in LBL USA's receivables almost seven years before Solera/DCM obtained its judgment against LBL USA.  After the UCC-1 statement lapsed, the Bank re-perfected its security interest almost one year before the restraining notice served on Turner that was submitted by Solera/DCM.  While the equities may have weighed against an assignee for no consideration in Int'l Ribbon, that is not the case here.

Solera/DCM further argues that it could have done no more to execute its judgment because the Turner funds were "not capable of delivery" until Turner settled its and the subcontractors'

---

[4] Although Solera/DCM stated at oral argument and in its submissions that it served Turner with a restraining notice and information subpoena in October 2006 (ct. doc. 214 at 1, 5, 8), the only restraining notice it submitted in support of its motion was served on October 12, 2007, long after the Bank re-perfected its security interest.  See ct. doc. 189, attachment 1; ct. doc. 214, Exh. 1.  Regardless, service of a restraining notice does not grant priority over other creditors.  See Aspen, 52 N.Y.2d at 579-80; Kitson, 778 N.Y.S.2d at 507.

claims in September 2007 and therefore "no physical levy or seizure of assets could have been effected." See ct. doc. 214 at 5, 8. Such an argument suffers from a flawed view of the execution and levy procedure under New York law. As a debt, the Turner funds are, by nature, "not capable of delivery" and thus not subject to levy by seizure under section 5232(b), which does not apply to intangible property. See Siegel, New York Practice § 497. However, a levy could have been effected under section 5232(a) which provides for levy by service of execution. Even if Turner's debt to LBL Canada was not due at the time that Solera/DCM obtained a judgment against LBL USA, the debt was subject to levy by service. See Marshak, 746 F.2d at 931 ("[i]n New York, a money judgment may be enforced against any debt, which is past due or which is yet to become due"); N.Y. C.P.L.R. § 5201(a); Siegel, N.Y. C.P.L.R. §§ 5201, 5232, Practice Commentaries, C5201:1, C5232:2. In fact, a contingent debt can be treated as "property" under N.Y. C.P.L.R. § 5201(b) and be subject to levy by service. See Marshak, 746 F.2d at 931 (section 5201(b) "permits enforcement of a money judgment against any property which could be assigned or transferred, whether or not it is vested"); Siegel, N.Y. C.P.L.R. § 5201, Practice Commentaries, C5201:5. Rather than serving Turner with restraining notices, in order to obtain priority in the debt, Solera/DCM should have instead delivered a writ of execution to the U.S. Marshal for service upon Turner to levy on the property

at issue.  In fact, that is precisely what Solera/DCM did in its efforts to collect a debt owed to LBL USA by APG-America, Inc. <u>See</u> ct. doc. 214, Exh. 9.  Before expiration of the 90 day period of the levy, Solera/DCM could then have moved for an extension of the period or commenced a special proceeding under either section 5225 or section 5227 of the CPLR.  Section 5225(b) authorizes a special proceeding by a judgment creditor to secure an order directing a third party garnishee to turn over to the creditor, in satisfaction of the judgment, "money or other personal property in which a judgment debtor has an interest."  Section 5227 authorizes an identical proceeding to direct a third party garnishee who "is or will become indebted to the judgment debtor" to pay that debt to the judgment creditor.

Solera/DCM also points to C.P.L.R. §§ 5202(a) and (b) as support for the proposition that the issuance of a writ of execution was sufficient to give it priority over the Bank. However, neither provision is relevant here.  Section 5202(b) applies only where a judgment creditor "has secured an order for delivery of, payment of, or appointment of a receiver of, a debt owed to the judgment debtor."  N.Y. C.P.L.R. § 5202(b).  Although section 5202(a) applies where a judgment debtor uses an execution, it governs only priorities between a judgment creditor and a transferee of the debtor.  Here, the Bank is not a transferee of the debtor; it is a secured creditor.  In any event, even if the Bank were a transferee, section 5202(a) does

not grant priority to a judgment creditor over a "transferee who acquired the debt or property for fair consideration before it was levied upon." As Solera/DCM acknowledges, an antecedent debt constitutes "fair consideration." Ct. doc. 214 at 8. Moreover, "whatever rights are obtained by issuance of the execution do not survive a return without satisfaction." Int'l Ribbon, 36 N.Y.2d at 124.

Solera/DCM also makes the strained argument that it has priority over the Bank by virtue of the trust fund provisions under the New York Lien Law. See ct. doc. 209 at 2. It is correct that Turner, as a contractor, and LBL Canada as a subcontractor, are required by Article 3-A of the Lien Law to hold funds they receive "in connection with a contract for a public improvement" in trust for the payment of expenditures arising out of "public improvement and incurred in the performance of [their] contract or subcontract ...," including "payment of claims of subcontractors..." Lien Law, §§ 70, 71. However, Solera/DCM is not a "beneficiary" within the intendment of the Lien Law since its claim does not "aris[e] out of the work performed in the construction here..." Harman v. Fairview Associates, 25 N.Y.2d 101, 106 (1969); see also Am. Blower Corp. v. James Talcott, Inc., 10 N.Y.2d 833, 286 (1961); Teman Bros., Inc. v. N.Y. Plumbers' Specialties Co., Inc., 444 N.Y.S.2d 337 (Sup. Ct. 1981). Since it was not a subcontractor of LBL Canada involved in the construction of the Islip project but a

subcontractor of LBL USA on a different construction project, it has no standing to claim priority to funds received in connection with the Islip project under the Lien Law.

Thus, I find that the Bank has established its priority to the assets of LBL USA, even assuming the Turner funds are properly considered assets of LBL USA.

Priority to the Assets of LBL Canada

Finally, it is undisputed that the Bank has priority over Solera/DCM to the assets of LBL Canada.  As discussed above, the law of the jurisdiction in which a debtor is "located" governs "perfection, the effect of perfection or nonperfection and the priority of a security interest in collateral."  N.Y. U.C.C. § 9-301(a).  This designation applies only to the substantive law of a particular jurisdiction, rather than that jurisdiction's choice of law rules, and applies whether the debtor is foreign or domestic.  See N.Y. U.C.C. § 9-301 and cmt. 3, 8.  A debtor that is an organization with more than one place of business is located at its chief executive office so long as that office "is located in a jurisdiction whose law generally requires information concerning the existence of a nonpossessory security interest to be made generally available in a filing, recording, or registration system as a condition or result of the security interest's obtaining priority over the rights of a lien creditor with respect to the collateral."  N.Y. U.C.C. § 9-307(b)(3), (c).  LBL Canada's chief executive office is located in Quebec, Canada.

Like the New York UCC, the Quebec Civil Code provides for a first to register or first to publish priority rule. Que. Civil Code §§ 2750, 2941, 2945; see also In re Flag Telecom Holdings Ltd., 2006 WL 3053075, at *3 n.2 (S.D.N.Y. Bankr. Oct. 23, 2006) (Canada is commonly considered to have a comparable filing system to the United States so that Uniform Commercial Code could require a filing there); Hans Kuhn, Multi-State and International Secured Transactions under Revised Article 9 of the Uniform Commercial Code, 40 Va. J. Int'l L. 1009, 1048, 1054 (2000). For example, publication of a security interest in the Register of Personal and Movable Rights makes the interest effective against third persons and establishes its priority. Que. Civil Code § 2725, 2934, 2941, 2945; Kuhn, supra at 1054. Accordingly, Quebec is the proper place for the Bank to register its security interest in LBL Canada's assets and Quebec law governs its perfection.

The Bank has submitted an affidavit from a Quebec lawyer purporting to be knowledgeable about secured transactions and Quebec law. See Affidavit of Michel La Roche dated March 19, 2008 ("La Roche Aff.") (ct. doc. 216-2). The Bank has also submitted the relevant provisions of the Quebec Civil Code referenced in the affidavit and the entire Quebec Civil Code is available on Westlaw and the internet. Despite an opportunity to do so, Solera/DCM has not submitted an affidavit challenging the Bank's interpretation of Quebec law. Under Fed. R. Civ. P. 44.1,

a court determining foreign law, "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." I find the Bank's affidavit sufficient to be considered under Rule 44.1.

The equivalent of a security interest in the Quebec Civil Code is a "hypothec" and is defined as a "real right on a movable or immovable property made liable for the performance of an obligation."[5] Que. Civil Code art. 2660; La Roche Aff. at ¶ 8; Kuhn, supra at 1049-50. A hypothec affecting movable property, like an account receivable, must be registered in the Register of Personal and Movable Real Rights to achieve priority. See Que. Civil Code art. 2663, 2934, 2941; La Roche Aff. at ¶¶ 10, 12. Rights in property rank according to the date, hour and minute entered in the Register of Personal and Movable Real Rights. See Que. Civil Code art. 2945; La Roche Aff. at ¶ 16. The registration of a movable hypothec is effective for ten years. See Quebec Civil Code art. 2798. Likewise, hypothecs securing the claims of judgment creditors must also be registered in the

---

[5] Under Quebec's choice of law rules, the validity of a security interest in accounts receivable is governed by the law of the country where the grantor was domiciled at the time of creation of the security. La Roche Aff. at ¶ 20; Que. Civ. C. art. 3105. Registration and its effects are governed by the law of the country in which the grantor is currently domiciled. Id. The domicile of a corporation is located at the place and address of its head office. La Roche Aff. at ¶ 21; Que. Civ. C. art. 307. Thus, even under Quebec's choice of law rules, Quebec law governs perfection and priority.

Register of Personal Movable Real Rights.  See La Roche Aff. at ¶ 18; Que. Civil Code art. 2724, 2725.

The Bank has established that it filed a valid registration in the Register of Personal and Movable Real Rights in the accounts receivable of LBL Canada in October 1999 for a period of ten years.[6]  See LaRoche Aff. at ¶¶ 25, 29.  There is no evidence that Solera/DCM registered its judgment in Quebec.  Accordingly, the Bank has priority to the accounts receivable of LBL Canada even if Solera/DCM were able to pierce the corporate veil between LBL USA and LBL Canada to secure its judgment against LBL USA.

In sum, I respectfully recommend that the Court find that the Bank has priority over Solera/DCM to the Turner funds since it had perfected security interests in the assets of LBL Canada and LBL USA that had priority over Solera/DCM, an unsecured judgment creditor.

Because I recommend finding that the Bank has priority to

---

[6] Solera/DCM appears to suggest that the Bank should have re-registered its security interest in 2001 when New York amended the UCC.  See ct. doc. 205 at 2-3.  However, the New York UCC provides that Revised Article 9 applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before Revised Article 9 takes effect.  N.Y. U.C.C. § 9-702.  The UCC further provides that if a security interest was perfected under former Article 9 and would be considered a perfected security interest under revised Article 9, no further action need be taken following the revisions to maintain the perfected security interest.  See N.Y. U.C.C. § 9-703 and cmt. 1.  Nonetheless, former section 9-103(3)(b), like current section 9-301(a), provided that the law of the debtor's location governed perfection of security interests in accounts and general intangibles.

the Turner funds, I need not address Solera/DCM's motion to enforce the subpoenas. As counsel for Solera/DCM conceded at oral argument, if the Court rules that the Bank has priority to the Turner funds, the subpoenas served on Turner are no longer relevant.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the restraining notices served on Turner be vacated and that Solera/DCM's motion to enforce its information subpoenas be denied. I further recommend that this Court direct that the Turner funds that have been deposited by the Clerk of the Court be disbursed to the Bank.

**SO ORDERED.**

Dated:    Brooklyn, New York
           April 2, 2010

                                    /s/
                                    MARILYN D. GO
                                    UNITED STATES MAGISTRATE JUDGE